**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PAUL E. COX, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-10456 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE RETIREMENT BOARD OF THE | ) | |
| COUNTY EMPLOYEES' AND OFFICERS' | ) | |
| ANNUITY AND BENEFIT FUND OF COOK | ) | |
| COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Cox, a former officer with the Cook County Sheriff's Office, injured his knee and shoulder while on the job. His injuries required surgeries and caused him to miss work. So he filed a workers' compensation claim, and also applied for duty disability benefits from the County Employees' and Officers' Annuity and Benefit Fund of Cook County.

This case is about his claim for duty disability benefits. Cox settled his workers' compensation claim for a lump sum. But the Retirement Board that oversees the Fund did not award him any additional duty disability benefits. The Board concluded that he wasn't entitled to additional disability benefits (beyond what he had already received a few years earlier), given the size of his workers' compensation settlement.

Cox originally sued the Sheriff of Cook County, alleging disability discrimination. But he later dropped the Sheriff and added the Board and its trustees as defendants. He is currently advancing four claims about the refusal to pay duty disability benefits. He alleges that the Board

and its trustees deprived him of property without due process, violated the Illinois Constitution, and breached their fiduciary duties.

The parties filed cross motions for summary judgment. For the reasons stated below, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.

## Background

### *The Accident*

Plaintiff Paul Cox began serving the public as a police officer for the Cook County Sheriff's Office in 1998. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Undisputed Material Facts ("SMF"), at ¶ 1 (Dckt. No. 190). A decade later, he suffered an injury that culminated in this lawsuit.

On May 17, 2009, Cox helped the State Police with a crash on interstate 55 in Chicago. *Id.* at ¶ 38; *see also* Cox Dep., at 9:14-19 (Dckt. No. 173-3, at 5 of 9). Responding to a car accident can be dangerous business for a police officer. But Cox lent a hand, helped a fellow officer, and put himself in harm's way.

He left his vehicle and apparently stood on the median. And then he took a tumble. When he jumped off the median, his knee buckled, and he fell to the ground. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 38 (Dckt. No. 190); *see also* Cox Dep., at 9:10-19 (Dckt. No. 173-3, at 5 of 9). He tore a tendon in his knee, and tore the rotator cuff in his right shoulder. *See* Cox Dep., at 9:10-19; *see also* 6/16/09 Attending Physician's Statement of Disability (Dckt. No. 215-2, at 2 of 3).[1]

---

[1] The collection of exhibits submitted by the parties left more than a little something to be desired. Some of the documents were incomplete. For example, Plaintiff filed only the first page of his application for duty disability benefits dated June 24, 2009, even though it is one of the key documents in the case. *See* 6/24/09 Benefits Application (Dckt. No. 176-1, at 81 of 129). Some exhibits were missing altogether,

Recovery was a long process. He needed surgeries on his knee and his shoulder. *See* 6/16/09 Attending Physician's Statement of Disability (Dckt. No. 215-2, at 2 of 3) (referring to surgery in June 2009 on his knee); *see also* 7/30/12 Attending Physician Statement of Disability (Dckt. No. 215-9, at 3 of 4) (referring to surgery in November 2011 on his shoulder). At one point, he was immobilized for six weeks. *See* 7/30/12 Attending Physician Statement of Disability (Dckt. No. 215-9, at 3 of 4). He never fully recovered.

The injury led to a long-drawn-out application process for disability benefits and workers' compensation. Before diving into the details, it is worth pausing to explain how an employee like Cox can apply for disability benefits.

### The Fund, and the Application Process

A Cook County employee may qualify for disability benefits when he or she becomes sick or injured. "The disability benefit is designed to provide compensation, in replacement of salary, for those injured or suffering from an illness that prevents them from working." *See* Disability Benefits Handbook ("Handbook"), at 4 (Dckt. No. 173-6, at 5 of 17).

Two types of benefits are available to employees – duty disability benefits and ordinary disability benefits. As the names suggest, the categories depend on when the injury happened. A "duty disability" involves an on-duty injury, and an "ordinary disability" involves an off-duty injury. *Id.* Cox suffered an injury while on the job, so he applied for duty disability benefits.

---

such as the applications for duty disability benefits from 2011 and 2013. Other exhibits were jumbled together en masse, without slipsheets, making it hard to figure out when some records ended, and others began. The exhibits were not in chronological order, either, making it difficult to digest the story. They lacked a table of contents, too. Overall, the parties submitted an impenetrable hodge podge of documents. The exhibits needed some tender loving care. So, the Court ordered the parties to refile a single, joint collection of exhibits. *See* 1/29/21 Order (Dckt. No. 211). The parties later did so. *See* Appendix of Joint Exhibits to the Parties' Cross-Motions for Summary Judgment (Dckt. No. 214). For ease of reference, the Court cites to the documents contained in that joint appendix, rather than the earlier collections filed by the parties.

*See* Defs.' Resp. to Pl.'s Rule 56.1 Statement of Uncontested Facts ("SMF"), at ¶¶ 8, 12 (Dckt. No. 187).

Under the Illinois Pension Code, "[a]ny employee who becomes disabled" in the line of duty "shall have a right to receive a duty disability benefit during any period of such disability for which he receives no salary." *See* 40 ILCS 5/9-156. But the statute places a limit on the amount of duty disability benefits that an employee can receive. "The benefit shall be 75% of salary at date of injury," if there was no preexisting injury. *Id.*

Employees of Cook County receive disability benefits through an administrative agency, Defendant County Employees' and Officers' Annuity and Benefit Fund of Cook County (the "Fund"). *See* Pl.'s Resp. to Defs.' SMF, at ¶ 4 (Dckt. No. 190). The Fund dispenses benefits as provided in the Illinois Pension Code. *Id.* at ¶ 3; *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts ("SAF"), at ¶ 1 (Dckt. No. 193).

The Fund is governed by the Retirement Board (the "Board"), which is also a defendant. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 5 (Dckt. No. 190). The Board has nine trustees, and they owe fiduciary duties to Fund participants. *Id.*; *see also* Defs.' Resp. to Pl.'s SMF, at ¶ 26 (Dckt. No. 187); 40 ILCS 5/1–101.2. The trustees review disability applications and decide if an applicant is eligible for benefits. *See* Pl.'s Resp. to Defs.' SMF, at ¶¶ 25–26.

The application process includes four steps (plus a fifth step for *duty* disability benefits, as explained below). *Id.* at ¶ 23. First, an employee must complete an application form and provide information about the date and nature of the disability. *Id.* Second, the employee's human resources department must fill out a statement verifying employment. *Id.* Third, the employee's attending physician must complete an "attending physician statement." *Id.* Fourth, after the disability department receives that paperwork, the Board must send the documents to a

Board-appointed physician.  *Id.*  The physician, in turn, must evaluate the employee and advise the Board on eligibility for disability benefits.  *Id.*

Applications for *duty* disability benefits (unlike ordinary disability benefits) require a fifth step:  the filing of a workers' compensation claim.  *See* 40 ILCS 5/9–159(d); *see also* Pl.'s Resp. to Defs.' SMF, at ¶ 17 (Dckt. No. 190).  That requirement comes from the statute itself: "Before any action may be taken by the board on an application for duty disability benefit . . . other than rejection of any such application that is otherwise incomplete or untimely, the related applicant must file a timely claim under the Workers' Compensation Act . . . ."  *See* 40 ILCS 5/9–159(d).  The purpose of that fifth step is "to establish that the disability or death resulted from an injury incurred in the performance of an act or acts of duty."  *Id.*

The Board will not make a decision on an application for duty disability benefits until an employee's claim for workers' compensation is resolved.  "Before any action may be taken by the board on an application for duty disability benefit . . . the applicant must receive compensation or payment from the claim or the claim must otherwise be finally adjudicated." *Id.*; *see also* Handbook, at 9 (Dckt. No. 173-6, at 10 of 17).

When it comes to the amount of a payment, the ceiling for workers' compensation claims is lower than the ceiling for duty disability claims.  Under the Illinois Workers' Compensation Act, an employee is entitled to receive 66.66% of their salary.  *See* 820 ILCS 305/8(b); Pl.'s Resp. to Defs.' SMF, at ¶ 18 (Dckt. No. 190).  Recall that the cap for duty disability benefits is 75% of the employee's salary.  So, if an employee receives workers' compensation, and then receives duty disability benefits, the Fund pays the difference (and only the difference).  *See* 40 ILCS 5/9–159(c) ("If an employee who shall be disabled . . . receive[s] any compensation or payment from the county for specific loss, disability, or death under the Workers' Compensation

Act . . . the disability benefit . . . shall be reduced by any amount so received or recoverable."). That is, the Fund pays the delta between 66.66% and 75% – so the Fund would pay 8.33% of the employee's salary. And nothing else.

The Fund's Disability Benefits Handbook explains the eligibility for benefits and the application process. The Handbook reinforces the notion that an employee must apply for workers' compensation for on-the-job injuries. "If an injury or illness occurred while in the performance of an act of duty, the employee must apply for Workers' Compensation with both the Cook County Department of Risk Management <u>and</u> submit an application for duty disability benefits with the Fund." *See* Handbook, at 5 (Dckt. No. 173-6, at 6 of 17) (emphasis in original); *see also id.* at 9 ("Before any action can be taken by the Board on an application for duty disability, an employee must file a timely claim for workers' compensation . . . and the applicant must receive compensation or payment for the claim or the claim must otherwise be finally adjudicated."). The employee must resolve the workers' compensation claim first, before the Board will approve an application. "All duty disability-related applications will be processed by the Fund and held pending a final decision by the Cook County Workers' Compensation Committee." *Id.* at 5.

After receiving all of the materials, the Board decides whether an applicant is entitled to disability benefits. The trustees work with the Board's disability department to make decisions about eligibility. *See* Pl.'s Resp. to Defs.' SMF, at ¶¶ 25–26 (Dckt. No. 190). The disability department consists of two disability counselors and one disability coordinator. *Id.* at ¶ 24. The department reviews the applications and makes recommendations on eligibility. *Id.* at ¶ 25.

If the Board decides that an applicant is eligible for duty disability benefits, the Board must determine the duration of the benefits. The statute entitles an employee to duty disability

benefits "during any period of such disability." *See* 40 ILCS 5/9-156. When deciding the disability period, the Board uses the Board-appointed physician's report, a risk management determination, and the temporary total disability periods (also called "TTD" periods) from the workers' compensation settlement agreement. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 6 (Dckt. No. 187).

There is an end point, too. For employees injured before age 60, the disability benefits end when the employee reaches the age of 65, at the latest. *See* 40 ILCS 5/9-156 ("If the disability commences on or after January 1, 1979, the benefit prescribed herein shall be payable during disability until the employee attains age 65 for disability commencing prior to age 60 . . . .").

In sum, a workers' compensation claim affects an application for duty disability benefits in three important ways. First, it affects the *timing* of benefits. The Board cannot approve a duty disability application until the resolution of a workers' compensation claim. Second, it affects the *amount* of benefits. The employee cannot receive more than 75% of his or her salary, and if he or she received 66.66% from workers' compensation for that period, then the employee can receive only 8.33% as duty disability benefits from the Fund. Third, it affects the *duration* of benefits. The Board may consider the temporary total disability periods when deciding the disability benefit periods. So it affects what he or she gets, and when he or she gets it, and for how long.

### Overview of Cox's Applications
### for Workers' Compensation and Duty Disability Benefits

Cox acted promptly to receive compensation for his injuries. He applied for workers' compensation twice, and applied for duty disability benefits three times.

The applications for duty disability benefits loom large in this suit. The punchline is that Cox submitted three applications for duty disability benefits: (1) on June 24, 2009; (2) on November 7, 2011; and finally (3) on June 18, 2013. But only two of those applications (the first and the third) are germane to this lawsuit. Plaintiff did not mention the second application in his Fourth Amended Complaint, or in his summary judgment briefs. Instead, he relied on the applications from 2009 and 2013 (only). *See* Pl.'s Resp. in Opp'n to Defs.' Mtn. for Summ. J., at 1 (Dckt. No. 189) ("In order to receive benefits, Plaintiff submitted two completed disability applications to the Pension Fund, one on June 24, 2009 and one on June 18, 2013.").[2]

---

[2] Cox did not mention anything about a second application (dated November 7, 2011) in his Fourth Amended Complaint, or in his summary judgment motion. In fact, in his Fourth Amended Complaint, Cox mentioned only the 2013 application. *See* Fourth Am. Cplt., at ¶ 26 (Dckt. No. 141) ("On or about June 18, 2013, Cox submitted an application to the Pension Fund seeking continuing in-the-line of duty disability payments . . . ."). Cox's summary judgment motion did the opposite. In the memorandum supporting his motion, Cox referred to only the 2009 application. *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 2 (Dckt. No. 175) ("On June 24, 2009, Cox submitted an application for duty disability pension benefits with the Defendant Pension Fund."). In his statement of facts, Cox described both the 2009 application and the 2013 application, but did not mention a 2011 application. *See* Pl.'s SMF, at ¶ 8 (Dckt. No. 176) ("On June 24, 2009, Mr. Cox submitted his application for duty disability pension benefits."); *id.* at ¶ 17 ("On or about June 18, 2013, Cox submitted an application to the Pension Fund seeking continuing in-the-line of duty disability payments . . . ."). He didn't point to the second application (from 2011) in his response to Defendants' motion for summary judgment, either. *See* Pl.'s Resp. in Opp'n to Defs.' Mtn. for Summ. J., at 1 (Dckt. No. 189) ("In order to receive benefits, Plaintiff submitted two completed disability applications to the Pension Fund, one on June 24, 2009 and one on June 18, 2013."). The existence of the second application came to light after this Court ordered the parties to redo their exhibits in support of their summary judgment motions. In the supplemental appendix of exhibits, the parties unveiled a copy of a 2011 application for the first time. *See* 11/7/11 Benefits Application (Dckt. No. 214-8). After learning about the existence of the 2011 application, the Court ordered the parties to clarify how many times Cox applied for benefits, and ordered Cox to confirm which applications he is relying on for his claims. *See* 4/5/21 Orders (Dckt. Nos. 218, 219). In response, both parties confirmed that Cox filed three complete applications for benefits: in 2009, 2011, and 2013. *See* Defs.' Supp. Resp., at 2–3 (Dckt. No. 226); Pl.'s Supp. Resp., at 1–2 (Dckt. No. 228). For the first time in his supplemental response, Cox stated that all *three* applications are at issue in this case. *See* Pl.'s Supp. Resp., at 3 (Dckt. No. 229) ("Plaintiff contends that the Defendant has issued, at most, a partial ruling for each of these three applications. . . . [E]ach of these three applications for disability are still relevant and at issue within this lawsuit."). It is far too late for Plaintiff to float a new theory of liability, long after the parties have briefed motions for summary judgment. That's a long way of saying that only two applications – the first one dated June 24, 2009, and the third one dated June 18, 2013 – are at issue in this lawsuit.

### Cox's Applications for Workers' Compensation

Cox applied for workers' compensation on May 28, 2009, less than two weeks after the accident. *See* 5/28/09 Workers' Compensation Application (Dckt. No. 176-1, at 113 of 129) ("Rendering assistance to stopped motorist on Interstate Road system, jumped over and down a 'Jersey Barrier', and landed, knee buckled"). The application requested compensation for the injury to his right leg.

Two months later, on July 21, 2009, he submitted a second workers' compensation application. *See* 7/21/09 Workers' Compensation Application (Dckt. No. 176-1, at 114 of 129). The second application covered his shoulder injury.

Each application listed the return-to-work date as "Unknown." He submitted each application to the Illinois Workers' Compensation Commission with the assistance of counsel. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 39 (Dckt. No. 190).

### Cox's First Application for Duty Disability Benefits *(in 2009)*

Meanwhile, Cox also applied for duty disability benefits. On June 24, 2009, a month after his injury, Cox started the ball rolling and filed an application. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 8 (Dckt. No. 187); Pl.'s Resp. to Defs.' SMF, at ¶ 40 (Dckt. No. 190).

In the application, Cox described the accident and added that he did not yet know the extent of his injuries. *See* 6/24/09 Benefits Application (Dckt. No. 214-2, at 2–3 of 4). He indicated that he first failed to appear at work because of the disability on May 19, 2009, meaning two days after the injury. *Id.*

The parties agree that he completed all five steps in his initial application. *See* Defs.' Resp. to Pl.'s SMF, at ¶¶ 4, 9, 14 (Dckt. No. 187). So, he completed the application form (#1), obtained verification of employment from the human resources department (#2), and submitted a

statement from his doctor (#3). The Board then received the input from a Board-appointed physician (#4). And meanwhile, he applied for workers' compensation (#5).

The Board approved his application for duty disability benefits a few months after the accident. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 41 (Dckt. No. 190). On August 6, 2009, the Board sent a letter "to notify you that at the meeting of the Retirement Board of the County Employees' Annuity and Benefit Fund of Cook County your application for Duty Disability was granted." *See* 8/6/09 Letter (Dckt. No. 214-6, at 2 of 2).

But the Board did not find that Cox was entitled to benefits forever. Instead, the Board determined that he was eligible for benefits for a discrete, five-month period in 2009, unless he returned to work before then. "The Board found that you are entitled to Duty Disability benefits from June 16, 2009 to November 17, 2009 inclusive, or until prior recovery or return to work at the daily rate of $144.38 per day, less Workers' Compensation Award leaving amount to be paid by the Fund at $16.22 per day." *Id.*; *see also* Defs.' Resp. to Pl.'s SMF, at ¶ 13 (Dckt. No. 187). The end date mirrored the County Physician Statement that Cox submitted with this application, which indicated a period of disability of "5/18/09 to 11/18/09."[3] *See* 7/1/09 County Physician Statement (Dckt. No. 215-3, at 2 of 2).

The Board enclosed a payment for "disability benefits now due." *See* 8/6/09 Letter (Dckt. No. 214-6, at 2 of 2). The parties don't reveal the amount of that payment.

---

[3] The parties don't explain the one-day difference between the disability period found by the Board (ending on November 17) and the period found by the physician (ending on November 18). In fact, neither party relied on this particular Physician Statement, or submitted it as an exhibit, in connection with their original Rule 56.1 Statements. The Court first received a copy of this statement after the Court identified gaps in the record and then directed the parties to file a joint collection of exhibits. *See* 1/29/21 Order (Dckt. No. 211); Appendix of Joint Exhibits to the Parties' Cross-Motions for Summary Judgment (Dckt. No. 214). So the Court refers to the document only to give a fuller picture of the facts.

Perhaps the Board jumped the gun, overlooking the then-pending claim for workers' compensation. One month later, on September 18, 2009, the Board's Disability Department sent Cox another letter, letting him know that it was putting the brakes on any payments until the resolution of his workers' compensation claim. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 42 (Dckt. No. 190).

"In regard to your payments for Duty Disability benefits, be advised that we have recently been informed that an application for adjustment of claim has been filed in your behalf at the Illinois Workers' Compensation Commission." *See* 9/18/09 Letter (Dckt. No. 214-7, at 2 of 2). The existence of the workers' compensation claim meant that disability payments could not continue. "Since based on Illinois State Statute we must reduce any duty disability benefit by any Workers' Compensation received or recoverable, we must defer payments until the outcome of your Workers' Compensation claim is known." *Id.*

### Cox's Second Application for Duty Disability Benefits (in 2011)

Then, Cox returned to work.[4] He worked from September 18, 2009 until November 1, 2011. *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2 of 3) (listing 9/18/09 as a "Return-to-work date"); 11/7/11 Benefits Application (Dckt. No. 214-8, at 2 of 3) (noting that Cox last worked on November 1, 2011).

But his shoulder injury continued to cause issues. He had rotator cuff surgery in November 2011. *See* 7/30/12 Attending Physician's Statement of Disability (Dckt. No. 214-9, at 2–4 of 4) (indicating surgery for rotator cuff repair on 11/2/11).

---

[4] The parties do not explain the details of Cox's return to work in their Rule 56.1 Statements. But in its review of the exhibits, the Court was able to deduce certain periods during which Cox appears to have been working. These periods are based on the dates Cox indicated he last worked in the disability benefit applications and the return-to-work dates listed in the workers' compensation agreement.

On November 7, 2011, a few days after surgery, he filed a second duty disability benefits application because of his shoulder injury. *See* 11/7/11 Benefits Application (Dckt. No. 214-8). He later submitted two more Physician Statements. *See* 11/11/11 Attending Physician's Statement of Disability (Dckt. No. 215-4, at 2–4 of 4); *see also* 11/23/11 County Physician Statement (Dckt. No. 215-5, at 2–3 of 3). As explained above, Cox doesn't rely on the 2011 application or the accompanying Physician Statements for his claims in this suit. Still, the Court mentions them in an effort to tell the full story (and avoid potential confusion).

A few weeks later, the Board responded. On November 29, 2011, the Disability Department sent a letter confirming that his application for disability benefits (with a claim date of 11/02/11) was in limbo while his application for workers' compensation remained pending. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 43 (Dckt. No. 190). "We will defer further processing of this application until such notification [of the resolution of the workers' compensation claim] is received." *See* 11/29/11 Letter (Dckt. No. 214-11, at 2 of 2).

Meanwhile, as his application for workers' compensation stalled, and his applications for disability benefits lingered, Cox continued to provide information to the Board about the condition of his shoulder. He filed a Physician Statement in January 2012 about the status of his rehabilitation since the surgery.[5] *See* 1/30/12 Attending Physician's Statement of Disability (Dckt. No. 215-6, at 2–4 of 4). After reviewing this statement, the County's physician recommended a period of disability from "11/2/11 through 5/1/12." *See* 2/8/12 County Physician Statement (Dckt. No. 215-7, at 2–3 of 3).

---

[5] None of the parties relied on this statement, or submitted it as an exhibit, in connection with their Rule 56 Statements. The Court first received a copy of this statement after directing the parties to file a joint collection of exhibits. *See* 1/29/21 Order (Dckt. No. 211); Appendix of Joint Exhibits to the Parties' Cross-Motions for Summary Judgment (Dckt. No. 214). So the Court refers to the document only to tell the full story.

Cox submitted yet another Attending Physician Statement in July 2012. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 10 (Dckt. No. 187); *see also* 7/30/12 Attending Physician's Statement of Disability (Dckt. No. 214-9, at 2–4 of 4). The doctor placed limits on how much he could lift over his head: 25 pounds for his right arm and 40 pounds for his left. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 10. When the County's physician evaluated this statement, he indicated that Cox's recommended period of disability was "11/2/11 through 7/19/12."[6] *See* 8/10/12 County Physician Statement (Dckt. No. 215-10, at 2–3 of 3).

Cox returned to work on July 25, 2012. *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2 of 3) (listing 7/25/12 as a "Return-to-work date"). But it didn't last long.

### Cox's Third Application for Duty Disability Benefits (in 2013)

About six months later, in January 2013, Cox stopped working again. *See* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2 of 3) (noting that Cox last worked on January 24, 2013). On June 18, 2013, he submitted a third (and presumptively final) application for duty disability benefits based on his shoulder and knee injuries. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 17 (Dckt. No. 187); *see also* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2–3 of 3) (describing the "nature of disability" as "right rotator cuff" and "right quadricep").[7]

---

[6] The parties brought this County Physician Statement to the Court's attention for the first time when the parties submitted the Appendix of Joint Exhibits, after the Court directed the parties to fill in the gaps and complete the record.

[7] As an aside, the form asked Cox if he had "received any workers' compensation/occupational disease benefits relating to this disability." *See* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2–3 of 3). Cox checked "Yes." *Id.* The reason for that answer is not entirely clear. Cox did not receive an answer on his application for workers' compensation until November 2014, long after he submitted his third application for duty disability benefits in June 2013. So, when he submitted that application, Cox had not yet received workers' compensation. Perhaps Cox was referring to the initial payment of duty disability benefits from the Fund in 2009. *See* 8/6/09 Letter (Dckt. No. 214-6, at 2 of 2).

In the application, Cox stated that he suffered the injury on May 17, 2009. *See* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2–3 of 3). He checked the box stating that he was currently disabled. *Id.* He left blank the part that asked when the "disability ended." *Id.*

In connection with this application, Cox filed another Attending Physician Statement. *See* 6/13/13 Attending Physician Statement (Dckt. No. 215-11, at 2–4 of 4). His doctor explained that even after his rotator cuff surgery and recovery, Cox continued to have "weakness above [his] chest." *Id.* As to Cox's ability to return to work, the doctor noted that he was discharged with permanent restrictions on July 18, 2012. *Id.*; *see also* Defs.' Resp. to Pl.'s SMF, at ¶ 10 (Dckt. No. 187).

Cox filed another Attending Physician Statement in September 2013. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 18 (Dckt. No. 187). Cox's doctor indicated that he had permanent restrictions on overhead lifting. *See* 9/11/13 Attending Physician Statement (Dckt. No. 215-13, at 4 of 4). The form contained a field where the doctor could certify a period of disability during which Cox would be unable to perform his job duties. *Id.* Rather than including a specific date range in that field, Cox's doctor crossed it out and wrote "permanent." *Id.*; *see also* Defs.' Resp. to Pl.'s SMF, at ¶ 18.

The County physician completed an evaluation of Cox's disability later that month. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 19 (Dckt. No. 187). He recommended the following period of disability: "8/1/13 through 12/23/13." *See* 9/25/13 County Physician Statement (Dckt. No. 215-14, at 3 of 3). The parties don't explain that end date, but it matches the date of the next evaluation recommended by the physician. *Id.* (suggesting another evaluation on "12/23/13").[8]

---

[8] The record does not reveal whether an evaluation occurred on December 23, 2013. But a follow-up evaluation did happen. In their supplemental answers to this Court's Order, Defendants provided a redacted copy of another County Physician Statement from May 2014 for the first time. *See* 5/19/14

On September 27, 2013, the Disability Department sent Cox yet another letter. Once again, they told him the same thing: they were playing the waiting game while his application for workers' compensation was under consideration. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 44 (Dckt. No. 190). "The Fund cannot act on an application or continue payment on an existing disability benefit payment until record of compensation payments or other final adjudication of such claim as applicable under the Workers' Compensation Act or the Workers' Occupational Diseases Act is received." *See* 9/27/13 Letter (Dckt. No. 214-24, at 2 of 2). Again, "[w]e will defer further processing of this application until such notification is received." *Id.*

### Cox's Return to Work, and Alternate Positions

The next part of the story is a bit hazy. As mentioned above, Cox apparently worked for the Sheriff's Office for three different periods after his injury. The parties don't discuss his return to work with any specificity in their Statements of Facts. But the exhibits point to January 24, 2013 as Cox's last day on duty.[9] *See* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2 of 3) (noting that Cox last worked on 1/24/13); *see also* Cox Dep., at 7:23-8:15 (Dckt. No. 173-3, at 5 of 9) (indicating that Cox stopped attending his employment with the Sheriff's Office at the end of January 2013).

In April 2014, Cox apparently expressed interest in submitting another duty disability application. Again, the parties don't flesh it out in their Statements of Facts. But one of the documents in the record says that Cox "reported to the Cook County Medical Unit on April 17, 2014 to apply for a duty disability application." *See* 4/17/14 Letter (Dckt. No. 214-25, at 2 of 2).

_____

County Physician Statement (Dckt. No. 226-2). This evaluation recommended a period of disability from January 24, 2013 through April 17, 2014. *Id.* (Dckt. No. 226-2, at 3 of 3).

[9] When reading the disability benefit applications in conjunction with the return to work dates listed in the Workers' Compensation Settlement, the details begin to emerge. Cox returned to work on September 18, 2009 after his May injuries. He then went on disability again from November 2, 2011 until he returned to work on July 25, 2012.

The Court assumes that Cox never submitted that (fourth) application for duty disability benefits.[10]  (Or, if he did, it's not part of this lawsuit.).

At the same time, the Sheriff's Office determined that Cox could no longer work as a police officer because of his physical restrictions.  *See* Pl.'s Resp. to Defs.' SMF, at ¶ 45 (Dckt. No. 190).  This determination and the query about additional benefits prompted a letter to Cox about openings for other positions.

The Sheriff's Office told Cox about two positions that would be consistent with his physical restrictions:  (1) Correctional Officer in the Visitation Center at the Cook County Department of Corrections, and (2) Administrative Assistant at the Sheriff's Police Department.[11]  *Id.*; *see also* 4/17/14 Letter (Dckt. No. 214-25, at 2 of 2).  Cox did not apply for either position.  *See* Pl.'s Resp. to Defs.' SMF, at ¶ 46 (Dckt. No. 190).

### *The Workers' Compensation Settlement*

In November 2014,[12] Cox reached a settlement with the Illinois Workers' Compensation Commission.  *See* Pl.'s Resp. to Defs.' SMF, at ¶ 47 (Dckt. No. 190); *see also* Workers'

---

[10]  The parties did not mention anything about a *fourth* application from April 2014 in their summary judgment filings.  They did not submit a copy of any such application, either.  So the Court has no information about a would-be application from April 2014 except the reference in the Sheriff's Office Letter.  Maybe the fourth application was simply an idea that Cox did not pursue.  Cox states in his response memorandum that he applied for benefits only *twice*, in 2009 and 2013.  *See* Pl.'s Resp. in Opp'n to Defs.' Mtn. for Summ. J., at 1 (Dckt. No. 189).  "Plaintiff submitted *two* completed disability applications to the Pension Fund, one on June 24, 2009 and one on June 18, 2013."  *Id.* (emphasis added).  As the Court noted above, he actually filed three complete applications for benefits.  But he is not relying on a fourth application in this case.  *See* Pl.'s Supp. Resp., at 3 (Dckt. No. 229) ("Plaintiff contends that the Defendant has issued, at most, a partial ruling for each of these three applications. . . .  [E]ach of these three applications for disability are still relevant and at issue within this lawsuit.") (referring to 2009, 2011, and 2013 benefits applications).

[11]  This Court ordered the parties to explain the significance of the fact that the Sheriff's Office flagged two other positions for him.  The parties draw attention to the search for a new position in their summary judgment filings, but didn't reveal why it matters.  In response to this Court's order, the parties confirmed that Cox's decision not to apply for either of the two recommended positions did not affect his eligibility for benefits.  *See* Defs.' Supp. Resp., at 8 (Dckt. No. 226); Pl.'s Supp. Resp., at 4–5 (Dckt. No. 228).

[12]  Cox agrees in his response to Defendants' Rule 56 Statement that he settled the claim in *December* (not November) 2014.  *See* Pl.'s Resp. to Defs.' SMF, at ¶ 47 (Dckt. No. 190).  But the Court notes that the

Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3). He agreed to resolve his claims for $115,611.41. *See* Pl.'s Resp. to Defs.' SMF, at ¶ 47; *see also* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3).

The written settlement agreement specified that Cox was "temporarily totally disabled" (it is a term of art – recall the acronym "TTD," which appears in some of the documents) for three discrete periods of time. *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3).[13] First, from July 3 to September 17, 2009. *Id.* Second, from November 2, 2011 to July 24, 2012. *Id.* Third, from February 11, 2013 to May 1, 2014. *Id.*

The parties did not shine any light on how, exactly, they arrived at those dates. So, the Court is somewhat in the dark about how they got there. The Court assumes that Cox worked during the intervening periods, and that he received workers' compensation for the period of time when he was *not* working (and thus not getting paid). That reading is consistent with the workers' compensation settlement agreement, which shows return to work dates of September 18, 2009 and July 25, 2012. *Id.*

The important thing is that the worker's compensation settlement agreement did not cover the entire period of time since the accident. It covered specific periods, only. And it was not prospective, either. The period ended on May 1, 2014.

---

settlement agreement includes attorney signatures dated October 2014, and an approval stamp dated November 5, 2014. *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3). Cox signed the settlement agreement but did not date it. *Id.* In the cover page for the joint exhibit, the parties agreed that the workers' compensation settlement agreement was dated November 5, 2014. *See* Dckt. No. 214-26, at 1 of 3; *see also* Appendix (Dckt. No. 214, at 3 of 4) (stating that the workers' compensation settlement agreement was dated "November 5, 2014").

[13] Look for the small – if not borderline unreadable – print an inch or two from the bottom of the page, in the line that begins "[t]he employee was temporarily totally disabled from [dates]." *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3).

17

### The Board's Decision

The resolution of the workers' compensation claims broke the logjam on the long-pending applications for disability benefits. On February 5, 2015, the Board sent Cox four letters. *See* 2/5/15 Letters (Dckt. Nos. 214-27, 214-28, 214-29, 214-30). Each letter covered a different disability benefit payment period.

The record, once again, is not as clear as one might hope to see. The letters from the Board did not expressly say which application(s) the Board was ruling on. For example, the Board's letter dated February 5, 2015 referred to the adjudication of "your claim" – singular, without specificity – when addressing the disability benefits payment period of June 16 to August 31, 2009. *See* 2/5/15 Letter (Dckt. Nos. 214-28). The other three letters use the same language. *See* 2/5/15 Letters (Dckt. Nos. 214-27, 214-29, 214-30). So the Board ruled upon three applications in four letters, without specifying *which* application, or applications, it was addressing in each letter.

The first letter covered the disability benefits payment period from June 16, 2009 through August 31, 2009. *See* 2/5/15 Letter (Dckt. No. 214-28). The letter reported that the Board had granted the request for benefits for that two-and-a-half month period. "Your application for duty disability benefits, in accordance with the final adjudication of your claim with the Illinois Workers' Compensation Commission, was presented to the Retirement Board on February 5, 2015. Your request for duty disability benefits was granted by the Retirement Board." *Id.*

But on that claim, Cox apparently owed money to the Fund, not the other way around. He already received more than he was entitled to receive. "After an adjustment in accordance with the final adjudication of your claim, you have an amount due to the Fund of $1,248.94." *Id.*

And a failure to pay "may result in the payment being deducted from your future annuity check(s)." *Id.*

Cox later paid in full. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 25 (Dckt. No. 187); *see also* 2/12/15 Letter (Dckt. No. 173-4, at 6 of 8). He now explains that he did so because he thought that he was going to receive future payments from the Fund. *See* Pl.'s SMF, at ¶ 25 (Dckt. No. 176). He points to the language in the letter about "your future annuity check(s)." *Id.*

The next three letters covered three other periods, respectively. That is, they separately addressed (1) September 1 to 17, 2009; (2) November 2, 2011 to July 18, 2012; and (3) January 26, 2013 to April 13, 2014. *See* 2/5/15 Letters (Dckt. Nos. 214-27, 214-29, 214-30). But the substance of each letter was otherwise the same.[14]

In those three letters, the Board informed Cox that the settlement of his workers' compensation claim affected his claim for duty disability benefits. Apparently, Cox recovered so much in that settlement that the Fund had no obligation to pay him anything else. "The Cook County Pension Fund ('the Fund') has been notified of a final adjudication of your claim under the Worker's [sic] Compensation Act. It has been determined that the final adjudication of your claim exceeds the 75% benefit payment obligation of the Fund." *Id.*

The letters did not spell it out, but the Board presumably relied upon the cap on benefits in the Illinois Pension Code and the Fund's Disability Handbook: "If a disabled employee

---

[14] Once again, the parties do not explain inconsistencies, leaving questions unanswered. The dates of the disability benefits periods do not line up perfectly with the dates for the workers' compensation periods (*i.e.*, the "TTD" periods). They are off by a few weeks. The workers' compensation settlement agreement covered three periods: (1) July 3 to September 17, 2009; (2) November 2, 2011 to July 24, 2012; and (3) February 11, 2013 to May 1, 2014. *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3). But the duty disability benefits covered periods that were similar, but not quite the same: (1) June 16 to August 31, 2009; (2) September 1 to 17, 2009; (3) November 2, 2011 to July 18, 2012; and (4) January 26, 2013 to April 13, 2014. *See* 2/5/15 Letters (Dckt. Nos. 214-27, 214-28, 214-29, 214-30).

receives any compensation or payment from the County under the Workers [sic] Compensation Act . . . the disability benefits shall be reduced by the amount received." *See* Defs.' Resp. to Pl.'s SMF, at ¶ 33 (Dckt. No. 187); *see also* 40 ILCS 5/9–159(c) ("If an employee who shall be disabled . . . receive[s] any compensation or payment from the county for specific loss, disability, or death under the Workers' Compensation Act . . . the disability benefit . . . shall be reduced by any amount so received or recoverable.").

So, "no payment is due" – from either side, apparently – on Cox's claim for disability benefits for those three periods of time. *See* 2/5/15 Letters (Dckt. Nos. 214-27, 214-29, 214-30).

But for each of the three periods, his "previously suspended disability benefit . . . has been processed in accordance with this claim to ensure all applicable pension benefit credit was applied to your account." *Id.* The parties don't provide an explanation, but the Handbook suggests that this benefit credit impacts a county employee's future *annuity* benefits, not disability benefits. *See* Handbook, at 5 (Dckt. No. 173-6, at 6 of 17) ("If disability benefits are granted, the County credits both employee and employer contributions and service credit for annuity purposes for the period approved.").

The fourth letter covering January 26, 2013 through April 13, 2014 is especially important. So, in the interest of clarity, the Court quotes the letter in full:

> The Cook County Pension Fund ("the Fund") has been notified of a final adjudication of your claim under the Worker's Compensation Act. It has been determined that the final adjudication of your claim exceeds the 75% benefit payment obligation of the Fund.
>
> While no payment is due, your previously suspended disability benefit for the period of January 26, 2013 through April 13, 2014 has been processed in accordance with this claim to ensure all applicable pension benefit credit was applied to your account.
>
> Please do not hesitate to contact the Disability Benefits Department at (312) 603-1200 with any questions.

20

*See* 2/5/15 Letter (Dckt. No. 214-30).

### *The Dispute*

The parties agree that Cox has not received any duty disability benefit payments beyond May 1, 2014 – the final date in the worker's compensation settlement agreement. *See* Defs.' Resp. to Pl.'s SMF, at ¶ 27 (Dckt. No. 187). That date (May 1, 2014) does not match the date in the last letter from the Board (April 13, 2014). The Board's letter dated February 5, 2015 referred to the period from "January 26, 2013 through April 13, 2014," not May 1, 2014. But once again, the parties do not explain it, abandoning the curious reader.

In any event, that is where the parties' dispute begins.

The parties disagree about whether an applicant must apply for continuation of duty disability benefits when the disability is permanent. *See* Pl.'s Resp. to Defs.' SMF, at ¶¶ 53–55 (Dckt. No. 190). Cox believes his granted benefit application should have automatically led to continuing benefits. *Id.* at ¶¶ 54–55. But Defendants argue that Cox was required to apply for continuation of those benefits even if the disability was permanent. *Id.* at ¶ 30; *see also* Defs.' Resp. to Pl.'s SMF, at ¶ 30 (Dckt. No. 187). In their view, the Board had no obligation to do anything else because they resolved all pending applications. That is, because the Board granted Cox's benefits for the applied-for periods, nothing further was owed without an additional application.

Cox also suggests in his summary judgment filings that he thought his applications were still pending. He claims disability counselor Dawn D'Amato told him on January 28, 2016 that the Board "had not rendered a final decision" on his "prior two applications." *See* Cox Affidavit, at ¶ 4 (Dckt. No. 191-1, at 33 of 33); *see also* Pl.'s SAF, at ¶ 20 (Dckt. No. 191). But

Defendants claim D'Amato never told Cox that he had any pending applications. *See* Defs.'
Resp. to Pl.'s SAF, at ¶ 20 (Dckt. No. 193); *see also* D'Amato Declaration (Dckt. No. 193-1).

This Court directed Cox to clarify which applications, if any, Cox believes are pending.
In response, Cox explained that all three completed applications were granted. *See* Pl.'s Supp.
Resp., at 1–2 (Dckt. No. 228) ("[A]ll applications are complete and were granted in Plaintiff's
favor finding duty disability."); *see also id.* at 2 ("It is Plaintiff's position that in three (3) of the
four (4) letters Plaintiff was approved (i.e. was granted the benefit requested) and all applicable
pension benefit credit was applied. . . . [E]ach letter corresponded to an application for each of
the duty disability benefits."). But he also "contends that the Defendant has issued, at most, a
partial ruling for each of these three applications." *See* Pl.'s Supp. Resp., at 2–3 (Dckt. No. 229).

It appears that Cox considered filing *another* application in February 2016. *See* 4/8/16
Letter (Dckt. No. 214-31, at 2 of 2); *see also* 2/6/16 Miscellaneous Documentation (Dckt. No.
227-2). But he never completed that application. *See* Pl.'s Supp. Resp., at 1–2 (Dckt. No. 228)
(confirming that Cox filed three complete applications in 2009, 2011, and 2013).

In April 2016, the Board sent a letter notifying Cox that it had received "miscellaneous
documentation related to an intended yet incomplete claim for disability benefits." *See* 4/8/16
Letter (Dckt. No. 214-31, at 2 of 2); *see also* Pl.'s Resp. to Defs.' SMF, at ¶¶ 52, 54 (Dckt. No.
190). "In order for the Retirement Board to make a decision on any claim, a complete
application must be filed in a timely manner. The enclosed documentation is incomplete and
therefore cannot be processed and/or presented to the Board for a decision." *See* 4/8/16 Letter
(Dckt. No. 214-31, at 2 of 2).

The Board invited Cox to apply. "If you still intend to file for disability benefits, please
contact the Fund to request an application." *Id.* But the Board never heard from Cox again. Cox

did not contact the Board to request an application.  *See* Pl.'s Resp. to Defs.' SMF, at ¶ 55 (Dckt. No. 190).  According to the parties, that letter was the last communication between them.

### *The Lawsuit*

Meanwhile, Cox filed this lawsuit against the Sheriff of Cook County in December 2014, after he had reached his worker's compensation settlement in November 2014, and before the Board resolved his applications for disability benefits in February 2015.  *See* Cplt. (Dckt. No. 1). He later dropped the Sheriff as a defendant and filed a series of amended complaints, culminating in the Fourth Amended Complaint.  *See* Fourth Am. Cplt. (Dckt. No. 141).

In a nutshell, Cox advances claims against the Fund itself, the Board, 14 current and former Board trustees, and the Fund's Legal Advisor Margaret Fahrenbach.  The gist of the complaint is that the Defendants violated the United States Constitution, the Illinois Constitution, and the Illinois Pension Code by not paying Cox disability benefits beyond April 13, 2014, even though he was permanently disabled and could not return to work after that date.

In his Fourth Amended Complaint, Cox raised five claims.  *Id.*  Judge Wood (this Court's predecessor before reassignment) dismissed Count II (a claim under the Illinois Wage Payment and Collection Act).  *See* 9-15-19 Order (Dckt. No. 177).  The Court recently dismissed the Fund, too.  *See* 5/3/21 Order (Dckt. No. 234).  So only four claims remain against the other defendants.

In Count I, Cox alleges violations of due process under Section 1983 against the Board and its current trustees in their official capacities.  In Count III, Cox claims that the Board violated the pension protection clause of Article XIII, section 5 of the Illinois Constitution.  In Count IV, Cox alleges that the Board violated unspecified provisions of the state and federal

23

constitutions. And in Count V, Cox alleges that the trustees and the Fund's Legal Advisor breached their fiduciary duties.

The submissions from the parties on the summary judgment motions left something to be desired. The record was incomplete. The exhibits were disorganized. The briefs at times seemed internally inconsistent, and talked passed each other. This Court issued a series of Orders to tighten things up. *See, e.g.,* 1/28/21 Order (Dckt. No. 210) ("The Court has reviewed the summary judgment briefs, including the exhibits cited by the parties. The collection of exhibits does not appear to be as complete or as user-friendly as one might hope. They are difficult to navigate.") (providing "four non-exhaustive examples"); 1/29/21 Order (Dckt. No. 211) ("The Court issues this supplemental directive in an attempt to make the collection of summary judgment exhibits more organized, readable, and digestible."); 4/5/21 Order (Dckt. No. 217) ("The Court reviewed the summary judgment submissions in detail. The parties provided both too much and too little information. The record includes a number of facts that do not seem material. But the record also had some holes, as this Court previously explained when it ordered the joint appendix, and the briefs left a number of unanswered questions. At times, it was difficult to discern what, exactly, the parties were arguing. Overall, the submissions from the parties are too inscrutable for the Court to issue a ruling without additional assistance from the parties."). That effort culminated in Orders directing the parties to file responses to a long list of questions. *See* 4/5/21 Orders (Dckt. Nos. 218–20). Overall, this Court spent a very significant amount of time and energy pouring over the record, identifying problems, and pointing at holes, trying to bring order to a disorderly record.

**Legal Standard**

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

When parties file cross motions for summary judgment, the Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011). The Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir.

2017); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## Discussion

### I.    Due Process (Count I)

Cox begins with a claim that the Board deprived him of his right to property without due process of law. *See* Fourth Am. Cplt., at ¶¶ 53–71 (Count I) (Dckt. No. 141). He claims that he "has suffered monetary damages by the loss of his duty disability pension benefits since April, 2014, and has suffered pain and suffering and other injuries." *Id.* at ¶ 68.

Before drilling down, the Court is compelled to note that the briefs are a muddy track. The record was incomplete, leaving a trail of unanswered questions. For example, it was not clear from the summary judgment briefs how many applications there were, and which ones were at issue.

To make matters worse, the parties seemed internally inconsistent, pointing the reader in different directions. At various times, Cox argues that his applications were granted (but not paid), denied, and never ruled upon. As an illustration, Cox simultaneously argues that the Board "granted each of Plaintiff's applications," and (two pages later) that "this is a circumstance where the Board has failed for the past six (6) years to render a decision on his disability application." *See* Pl.'s Supp. Resp., at 4, 6 (Dckt. No. 229). As a second example, sometimes Cox argues that the Board denied his applications, and at other times, he argues that the Board granted his applications but refused to pay. *Compare* Pl.'s Mem. in Supp. of Summ. J., at 7 (Dckt. No. 175) ("Plaintiff respectfully request[s] that this Court find Defendants violated Plaintiff's due process rights by unilaterally denying his continued duty disability benefits.")

*with* Pl.'s Resp. to Defs.' SMF, at ¶¶ 32 (Dckt. No. 190) ("The Board did not deny any benefits to Plaintiff, instead it approved benefits and failed to pay future payments.").  Was the application granted?  Denied?  Not ruled upon?

To compound the problem, all parties overplay their hands.

The theory of the complaint is not, as one might expect, that the Board denied his request for duty disability benefits after April 2014.  Instead, Cox's theory is that his 2013 application is *still pending*.  That is, Cox claims that the Board has been sitting on its hands for years, and has not yet made a decision on whether to award him benefits after April 2014.  "The Trustees failed to act on Cox's June 18, 2013 continuing duty disability pension application and Cox did not receive a determination from the Trustees that his application for disability benefit was approved, that additional information was requested, or denied."  *See* Fourth Am. Cplt., at ¶ 56 (Dckt. No. 141); *see also id.* at ¶ 58 (alleging that the Board has "failed to take appropriate steps to see that continuing duty disability pension applications were appropriately and timely processed").

"The Trustees' failure to take appropriate steps to see that Cox's continuing duty disability pension application was processed in an appropriate and timely manner deprived Cox of his due process rights under the 14th Amendment to the United States Constitution."  *Id.* at ¶ 60; *id.* at ¶ 63 ("The Defendants have refused to proceed with Plaintiff's request for pension benefits and have not provided Plaintiff with any notice or opportunity to be heard regarding why Defendants have failed to provide him benefits or proceed on his application.").  So, in his view, the Board has denied him due process because Cox has had "no opportunity to challenge the failure to provide continuing duty disability pension benefits."  *Id.* at ¶ 57.  He had "no opportunity to challenge" the decision because the Board hasn't *made* a decision.  *Id.*

That argument is more than a little difficult to square with the four letters that the Board

sent Cox on February 5, 2015. The Board notified Cox that the final adjudication of his worker's

compensation claim "exceeds the 75% benefit payment obligation of the Fund." *See* 2/5/15

Letter (Dckt. No. 214-30). So Cox knew the bottom line: "no payment is due." *Id.*

The phrase "no payment is due" means that the Fund didn't owe him anything. Cox

could not reasonably think that he had a pending application after the Board told him that "no

payment is due." *Id.* If "no payment is due," then Cox reached the end of the line. The most

natural reading is that the Board denied his request for benefits (or, at the very least, refused to

grant them), not that the Board was still thinking it over.

The theory of the complaint – that is, the theory that the Board has not yet ruled on the

2013 application – is also inconsistent with Cox's own supplemental statements. In response to

written questions from the Court, Cox confirmed that the Board did, in fact, rule upon all

pending applications. *See* Pl.'s Supp. Resp., at 1–2 (Dckt. No. 228) ("[A]ll applications are

complete and were granted in Plaintiff's favor finding duty disability."); *see also id.* at 2 ("It is

Plaintiff's position that in three (3) of the four (4) letters Plaintiff was approved (i.e. was granted

the benefit requested) and all applicable pension benefit credit was applied. . . . [E]ach letter

corresponded to an application for each of the duty disability benefits.").

The Board, for its part, floats an unreasonable interpretation of its own, rivaling the

unreasonable interpretation peddled by Cox. The Board's position is not that it considered Cox's

application, and denied it. Instead, the Board contends that Cox applied in 2013 but *never*

*applied* for benefits for the period after April 2014 *at all*. *See* Defs.' Supp. Resp., at 2 (Dckt. No.

227) ("Plaintiff did not apply for duty disability benefits after May 1, 2014."); *id.* at 3 ("Plaintiff

did not apply for a continuation of benefits for the period after April 13, 2014."); *id.* at 4

("Plaintiff's duty disability benefits for the period after April 13, 2014 were never denied because Plaintiff did not apply for duty disability benefits after this date."); *see also* Defs.' Supp. Resp., at 4 (Dckt. No. 226) ("Joint Exhibit 30 [the Board's letter dated February 5, 2015] was not a denial of an application for benefits covering the period after April 13, 2014 because Plaintiff did not apply for a continuation of benefits for the period after April 13, 2014."); *id.* at 5 ("Defendants' position is that Plaintiff never applied for a continuation of duty disability benefits for the period after April 13, 2014, as he was required to do under the Fund's handbook."); *id.* at 6 (same).

That position is, once again, difficult to square with the record. Cox submitted an application for duty disability benefits on June 18, 2013. *See* 6/18/13 Benefits Application (Dckt. No. 214-18, at 2–3 of 3). Cox didn't limit the time period of his application. The application was open-ended, meaning that he did not apply for benefits for a period from Date X to Date Y. Cox checked the box to indicate that he was "currently disabled." *Id.* When the form asked when the disability ended, Cox left it blank. *Id.* Cox supported the application with a statement from his doctor, who opined that his injuries were "permanent." *See* 9/11/13 Attending Physician Statement (Dckt. No. 215-13, at 4 of 4); *see also* 6/13/13 Attending Physician Statement (Dckt. No. 215-11, at 3 of 4, 4 of 4) (pointing to "perm. weakness above chest" and "perm. rest.").

So, Cox submitted an open-ended application, and in response, the Board sent him a letter saying that "no payment is due." *See* 2/5/15 Letter (Dckt. No. 214-30). True, the Board's letter was less than entirely clear about the time period at issue. The first paragraph referred to "your claim," without more. The second paragraph began with the phrase "[w]hile no payment is due," and it referenced the "period of January 26, 2013 through April 13, 2014" when

discussing *pension* benefit credit (which is different than duty disability benefits). *Id.* ("While no payment is due, your previously suspended disability benefit for the period of January 26, 2013 through April 13, 2014 has been processed in accordance with this claim to ensure all applicable pension benefit credit was applied to your account."). Reading the letter as a whole, it seems clear that the Board concluded that Cox did apply for duty disability benefits through April 13, 2014.

If that's correct, then it is difficult to see how the Board's theory (*i.e.,* that Cox never applied for benefits beyond April 2014) could hold water. During oral argument, the Board's counsel conceded that Cox applied for duty disability benefits through at least April 13, 2014. *See* 4/22/21 Tr., at 27–28 (Dckt. No. 235). But there is no reason to think that Cox *did* apply for duty disability benefits through April 13, 2014, but did *not* apply for benefits after that period. After all, the application itself didn't include an end date, let alone an end date of April 13, 2014.

The Board argues that Cox "did not apply" for duty disability benefits "after April 13, 2014," but the Board seemingly pulled that date out of the ether. *See* Defs.' Supp. Resp., at 4 (Dckt. No. 227). The application itself included no such limitation. The fact that the Board did not *grant* benefits after April 13, 2014 does not mean that Cox did not *apply* for that period. It is awkward to argue, in effect, "If I don't grant your request, *you didn't make it*."

The Board bases its Cox-didn't-apply argument on a requirement that an applicant must be examined by a County doctor on an annual basis. The Pension Code provides that "[e]ach disabled employee who receives duty or ordinary disability benefit shall be examined at least once a year by one or more licensed and practicing physicians appointed by the board." *See* 40 ILCS 5/9-158. The Board transforms that duty to see a doctor once a year into a duty to apply for benefits once a year. "In practice, based on this statutory language, the Board requires that

employees who receive duty disability benefits apply for a continuation of benefits at least once a year." *See* Defs.' Supp. Resp., at 2 (Dckt. No. 227).

But even if the duty to see a doctor means that there is a duty to reapply, that obligation would not cut short the period of Cox's application. Cox submitted his application on June 18, 2013, and the County physician examined him on September 25, 2013. *See* 9/25/13 County Physician Statement (Dckt. No. 215-14, at 3 of 3). A County physician examined him in May 2014, too. *See* 5/19/14 County Physician Statement (Dckt. No. 226-2, at 2 of 3). Based on that chronology, there's no discernible reason to think that Cox applied through April 2014, but *didn't* apply from May 2014 onward. He last saw a County doctor in May 2014, after the end of the duty disability period in April 2014.

All of this is a long way of saying that the parties cloud the issue and muddy the record, so much so that it is difficult to navigate a path out. Neither side adequately captures what took place. Much of the fault lies with the Board itself, for issuing four sphinx-like letters that were bound to create confusion. The Board should have said, in a straightforward way, that it was granting Cox's application for duty disability benefits for Period X, and denying (or at least not granting) his application for benefits for Period Y.

Overall, the Court understands the undisputed material facts as follows. Cox submitted an open-ended application on June 18, 2013 that was not time limited. He applied for benefits for the indefinite future, based on the notion that he was permanently injured. On February 5, 2015, the Board granted that application in part. The Board recognized that Cox was disabled, but the Board only granted his application through April 13, 2014.[15]

---

[15] That date is consistent with the County Physician Statement dated May 19, 2014, which Defendants did not submit with the summary judgment materials, or in the subsequent Appendix of Joint Exhibits. *See* 5/19/14 County Physician Statement (Dckt. No. 226-2, at 2 of 3). The County physician recommended a period of disability running through April 17, 2014. That's close to the date (April 13,

That letter dated February 5, 2015 was, in effect, a grant and a denial of benefits (or, at the very least, a grant of benefits for only a limited period). The Board granted Cox's application from January 26, 2013 through April 13, 2014, but no money was owed for that period. He wasn't owed any money because he received everything that he was entitled to receive through the workers' compensation settlement. Then, the Board denied Cox's application from April 13, 2014 onward (or, at the very least, the Board did not *grant* the application after April 13, 2014). The Board seemingly did so (without saying so out loud) based on the County Physician Statement dated May 19, 2014, which found a disability through April 17, 2014 (only).

At that point, Cox needed to *re*apply if he wanted more benefits. The Handbook recognized the potential need for supplemental applications. "If you remain disabled at the end of the granted disability period and also remain eligible for continued benefits (i.e., maximum benefit period has not expired, no termination of employment or member status, etc.), you are required to request and submit an application for a continuation of your disability benefit." *See* Handbook, at 12 (Dckt. No. 173-6, at 13 of 17); *see also id.* ("If your disability period is

<hr />

2014) in the Board's letter dated February 5, 2015. The Court does not understand why the Board failed to file this letter with its summary judgment materials. The Board even failed to provide this letter in the Appendix of Joint Exhibits, after this Court explained how out of sorts the materials were from the parties. *See* Appendix of Joint Exhibits to the Parties' Cross-Motions for Summary Judgment (Dckt. No. 214). The County Physician Statement dated May 19, 2014 came to light only after this Court posed a series of written questions (Dckt. Nos. 217–220), and after this Court presided over a hearing on the summary judgment motions on April 22, 2021 (Dckt. No. 221). It took some doing, but at oral argument, counsel for the Board acknowledged that the County Physician Statement from May 2014 was part of the basis for the Board's decision. *See* 4/22/21 Tr., at 27–32 (Dckt. No. 235); *see also* Defs.' Supp. Resp., at 7 (Dckt. No. 226) ("Plaintiff last received a workers' compensation payment from Cook County on April 13, 2014, and the Board-appointed physician determined that Plaintiff's disability ended on April 17, 2014. . . . Based on this evidence, the Board determined that Plaintiff was eligible for receipt of duty disability benefits through April 13, 2014."); Defs.' Supp. Statement, at 5 (Dckt. No. 232) ("[T]he Board determined Plaintiff was eligible for receipt of duty disability benefits through April 13, 2014 based on the Board's appointed physician's statement dated May 19, 2014 and workers' compensation records from Cook County Risk Management.").

expected, per your physician statement, to continue beyond the initial approved period, an application packet to continue the benefit must be requested from the Fund.").

Cox submitted an application in June 2013, and the Board found that he was disabled through mid-April 2014. If Cox wanted benefits from mid-April 2014 forward, he needed to submit another application. So, instead of arguing that Cox never applied for the period after April 13, 2014 at all, the Board's counsel should have argued that Cox never *re*applied for benefits for the period after April 13, 2014.

Here's the key point. The parties debate what, exactly, the Board did in its letter dated February 5, 2021. Cox floats an armada of theories – that the Board never ruled, or maybe that the Board denied the application, or maybe that the Board granted the application but simply refused to pay after April 13, 2014. The Board, for its part, argues that it granted the request for benefits through April 13, 2014, and that the Board made no decision thereafter because Cox never applied for the period after April 13, 2014. A better reading is that the Board granted the application through April 13, 2014, and denied – or at the very least, did not *grant* – benefits after April 13, 2014.[16]

Whatever happened for the period after April 13, 2014, the key point is that the Board did not grant benefits after April 13, 2014. So Cox had no right – no *property* interest – in benefits for the period after April 13, 2014.

With that backdrop, the difficulties with Cox's claim come to light. In the Fourth Amended Complaint, Cox claims that the Board deprived him of due process by failing to make a decision on his June 2013 application for benefits. *See* Fourth Am. Cplt., at ¶¶ 53–71 (Dckt. No. 141). That is wrong. The Board granted his request for benefits through April 13, 2014, and

---

[16] The legal significance of the letter dated February 5, 2015 is a question of law, not a question of fact.

did not grant benefits for the period after April 13, 2014. The Board didn't deprive him of due process by failing to make a decision (*see* Fourth Am. Cplt., at ¶¶ 53–71), because the Board *did* make a decision.[17]

If Cox's theory of the case is that the Board has not yet ruled, he loses. The Board did rule, and decided that he was entitled to benefits through April 13, 2014 (only). But Cox was not bound by the legal theory in his complaint, so he was free to switch to a different legal theory midstream. *See Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) ("Complaints plead *grievances*, not legal theories.") (emphasis in original); *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 561 (7th Cir. 2011) ("A complaint need not plead legal theories."); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.").

Cox advanced a different argument in his summary judgment briefs. He argues that the Board deprived him of property without due process when it did not award benefits for the period after April 13, 2014 (either because the Board *denied* his application, or *granted* the application but refused to pay). That theory is different than the theory in his complaint, but changing theories is fair game, so the Court will consider it. *Compare* Fourth Am. Cplt., at ¶¶ 56, 60 (Dckt. No. 141) ("The Trustees failed to act on Cox's June 18, 2013 continuing duty disability pension application and Cox did not receive a determination from the Trustees that his application for disability benefit was approved, that additional information was requested, or denied. . . . The Trustees' failure to take appropriate steps to see that Cox's continuing duty

---

[17] Defendants invoke the *Younger* abstention doctrine in passing in their summary judgment response brief. *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J, at 10–11 (Dckt. No. 186). That doctrine typically applies to ongoing criminal proceedings, but it can apply to civil proceedings in narrow circumstances. *See Younger v. Harris*, 401 U.S. 37, 43–44 (1971); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071–72 (7th Cir. 2018). The doctrine does not apply here because there is no ongoing state proceeding and no state court order is at issue. The Board made its decision on Cox's 2013 application.

disability pension application was processed in an appropriate and timely manner deprived Cox of his due process rights under the 14th Amendment to the United States Constitution.") *with* Pl.'s Mem. in Supp. of Summ. J., at 7 (Dckt. No. 175) ("Plaintiff respectfully request[s] that this Court find Defendants violated Plaintiff's due process rights by unilaterally denying his continued duty disability benefits.").

### A. The Lack of a Property Interest

Cox's due process claim fails for the simple reason that he had no property interest in duty disability benefits unless and until the Board awarded them. And the Board did not award disability benefits after April 13, 2014.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1. A due process claim has two elements. A plaintiff must prove a "(1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008).

The first element "involves a two-fold examination: a) whether a protected property interest exists; and b) whether [the plaintiff] was deprived of that protected interest." *See Dixon v. City of New Richmond*, 334 F.3d 691, 694 (7th Cir. 2003). In any due process claim, "the threshold question is whether a protected property interest actually exists." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).

The Constitution presupposes, but does not create, property interests. *Id.* ("Property interests are not created by the Constitution . . . ."). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of

entitlement to those benefits." *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*; *see also Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010); *Dixon*, 334 F.3d at 694. "'[A] protected property interest exists only when the state's discretion is clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met.'" *See Bell v. City of Country Club Hills*, 841 F.3d 713, 719 (7th Cir. 2016) (quoting *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012)); *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) ("Where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement."). "A disability benefit that is a matter of right, not of grace, is a property right within the meaning of the due process clause." *Schroeder v. City of Chicago*, 927 F.2d 957, 959 (7th Cir. 1991).

Illinois law determines whether Cox had a vested property interest in duty disability benefits. "Although '[w]hether a particular expectation rises to the level of a vested right is not capable of precise definition' . . . a right has not vested until it is 'so far perfected that it cannot be taken away by legislation,' and so 'complete and unconditional' that it 'may be equated with a property interest.'" *Dardeen v. Heartland Manor, Inc.*, 186 Ill. 2d 291, 238 Ill. Dec. 30, 710 N.E.2d 827, 830 (1999) (citation omitted).

Here, Cox claims that the Pension Code creates a property interest in duty disability benefits. The Pension Code provides that a Cook County employee injured on duty "shall have a right to receive a duty disability benefit during any period of such disability for which he

receives no salary." *See* 40 ILCS 5/9-156. The benefit "shall be 75% of salary," and "shall be payable during disability until the employee attains age 65 for disability commencing prior to age 60." *Id.*

But the right is conditional, not absolute. For example, an employee is entitled to benefits only if he or she applies while the disability exists, and only after exhausting a claim for workers' compensation. *See* 40 ILCS 5/9-156; 40 ILCS 5/9–159(c), (d).

More importantly for present purposes, an employee is entitled to duty disability benefits only if the employee "becomes disabled." *See* 40 ILCS 5/9–156. As the Handbook states, one of the "Eligibility Requirements" is that the employee must be "disabled (1) at the time of application . . . and (2) during the entire requested/granted benefit period." *See* Handbook, at 5 (Dckt. No. 173-6, at 6 of 17).

The Board is charged with deciding when an employee is – and is not – disabled. The Board must receive "proof" of disability from a Board-appointed physician. *See* 40 ILCS 5/9-158 ("Proof of duty or ordinary disability shall be furnished to the board by at least one licensed and practicing physician appointed by the board, except that this requirement may be waived by the board for proof of duty disability if the employee has been compensated by the county for such disability or specific loss under the Workers' Compensation Act or Workers' Occupational Diseases Act."). A finding of "duty disability" requires "satisfactory proof," and it is up to the Board to decide whether the "proof" is "satisfactory." *Id.*; *see also id.* ("The board may require other evidence of disability."). And benefits end when the disability ends. *Id.* ("When the disability ceases, the board shall discontinue payment of the benefit."); *see also* Handbook, at 14 (Dckt. No. 173-6, at 15 of 17) ("The disability benefit will cease upon: . . . Granted disability period ends.").

The Board has the statutory authority to decide when an employee is disabled.  *See* 40 ILCS 5/9-190 ("The board shall have the powers and duties stated in Sections 9-191 to 9-202.1, inclusive, in addition to such other powers and duties provided in this Article"); 40 ILCS 5/9-196 (empowering the Board to "authorize . . . the payment of any . . . benefit in accordance with this Article," and vesting the Board with "exclusive original jurisdiction in all matters relating to the fund, including . . . all claims for . . . benefits"); 40 ILCS 5/9-159(d) (noting that "the board" is the entity that takes "action" on "an application for duty disability benefit"). Under the Pension Code, unless and until the Board decides that an employee is disabled, the employee has no right to disability benefits.  *See Schroeder v. City of Chicago*, 715 F. Supp. 222, 223–24 (N.D. Ill. 1989), *aff'd*, 927 F.2d 957 (7th Cir. 1991) ("Under the Illinois Pension Code, an injured firefighter may not receive duty disability benefits until the Retirement Board has authorized payment of such benefits.  Consequently, until the Retirement Board ruled on Schroeder's application, he had no legitimate claim of entitlement to benefits.") (citing 40 ILCS 5/6-179, 6-185).  An employee has no property right to duty disability benefits until the Board decides that the employee is entitled to them.

The Board decided that Cox was entitled to duty disability benefits through April 13, 2014, but not after.  *See* 2/5/15 Letter (Dckt. No. 214-30).  Presumably the Board *couldn't* have decided that he was entitled to benefits after April 13, 2014 on the record at hand at the time. Under the statute, a physician appointed by the Board must provide "[p]roof of duty or ordinary disability."  *See* 40 ILCS 5/9–158.  The County physician decided that Cox was disabled through April 17, 2014.  *See* 5/19/14 County Physician Statement (Dckt. No. 226-2, at 3 of 3) ("Recommended period of disability based on evaluation:  FROM 1/24/13 THROUGH

4/17/14"). The Board thus lacked proof from a Board-appointed doctor of a disability after April 17, 2014, so its hands were tied.

Cox seems to believe that he was entitled to a finding of disability for all time because the Board recognized that he had a disability. *See* Pl.'s Mem. in Opp'n to Defs.' Mtn. for Summ. J., at 5–6 (Dckt. No. 189) ("[O]nce Plaintiff was granted a duty disability benefit by the Pension Board, he had a legitimate claim, according to the Pension Code, to continue to receive the disability benefits."). But the existence of a disability is not an in-for-a-penny, in-for-a-pound proposition. An employee is not entitled to receive disability benefits in perpetuity simply because the Board finds a disability for some time period. An employee is entitled to receive duty disability benefits for the time period granted by the Board, and nothing more. When the "[g]ranted disability period ends," then the "disability benefit will cease," too. *See* Handbook, at 14 (Dckt. No. 173-6, at 15 of 17).

At best, Cox had a right to seek disability benefits, but nothing else. A hope or expectation for benefits is not enough to give rise to a property interest. *See Khan*, 630 F.3d at 527; *Roth*, 408 U.S. at 576 ("The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has *already acquired* in specific benefits.") (emphasis added). The Pension Code entitled Cox to disability benefits for a certain period if and only if the Board found him to be disabled for that period. The Code entrusted the Board with decision-making power, vesting it with discretion to decide whether a particular applicant is disabled. The Board exercised that power and did not find that Cox was disabled after April 13, 2014.

Cox had no property interest in duty disability benefits after April 13, 2014 because the Board never decided that he was entitled to benefits after that date. Without a property interest in duty disability benefits, Cox has no due process claim.

**B.      The Availability of State Process**

Even if, for the sake of argument, Cox had a vested property interest in duty disability benefits, the denial of benefits would not necessarily give rise to a claim. A denial of state benefits, without more, is not enough to give rise to a federal due process claim.

It is worth remembering that Cox is not exactly bringing a claim for the denial of benefits. He is bringing a claim for a denial of due process. That is, he takes aim at the state's procedure. He argues that the state took something away from him without affording him "process" that was "due." *See* U.S. Const. amend. XIV, § 1.

But the Due Process Clause is not a backdoor way to challenge any and every denial of state benefits. *See Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013) ("But [Plaintiff] does not want a hearing. He wants money. That's what the due process clause does *not* guarantee; the federal entitlement is to process, not to a favorable outcome.") (emphasis in original).

Here, Cox did not have a pre-deprivation hearing. But he did have the right to pursue an administrative hearing and state court review of the Board's decision. The availability of that post-deprivation procedure means that no pre-deprivation hearing was necessary. *See Buttitta v. City of Chicago*, 9 F.3d 1198, 1206 (7th Cir. 1993) (holding that, as in *Mathews v. Eldridge*, because "the question . . . is whether the plaintiff was disabled, the answer depends upon medical reports, and the risk of erroneous deprivation is too slight to require a pre-deprivation hearing") (citing *Mathews*, 424 U.S. 319, 335 (1976)); *Michalowicz*, 528 F.3d at 536 (noting that "when

40

adequate post-termination proceedings exist, a pretermination hearing need only provide 'an initial check against mistaken decisions'") (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)); *see also Rosario v. Ret. Bd. of Policemen's Annuity & Ben. Fund of City of Chicago*, 2013 WL 842651, at *6 (N.D. Ill. 2013), *aff'd* 743 F.3d 531 (7th Cir. 2014) (holding that plaintiffs "received due process when they filed their initial applications to obtain pension credit" and when they "had the opportunity . . . to appeal the Board's decisions to the Illinois state courts pursuant to the Administrative Review Law").

Cox did not take advantage of state procedures that were afforded to him. "[A] plaintiff who foregoes her right to pursue post-deprivation remedies available under state law faces a high hurdle in establishing a due process violation." *See Tucker v. City of Chicago*, 907 F.3d 487, 492 (7th Cir. 2018). "The due process clause does not permit a litigant to disdain his opportunities under state law and then demand that the federal judiciary supply a remedy." *See Simmons*, 712 F.3d at 1044; *see also Leavell v. Illinois Dep't of Nat. Res.*, 600 F.3d 798, 800 (7th Cir. 2010) (finding that a plaintiff's "failure to avail herself of available state remedies is, therefore, fatal to her federal due process claim"); *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982) ("[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."). The Due Process Clause does not help those who do not help themselves (under state law).

If Cox believed that the Board wrongfully denied his application for benefits, then he had a state process at his fingertips. In fact, the Handbook lays out how to appeal the Board's decision. *See* Handbook, at 13 (Dckt. No. 173-6, at 14 of 17). An applicant can submit a request for an administrative hearing within 30 days of receiving the Board's initial determination. *Id.* At that point, the Board appoints a hearing officer, conducts a hearing, reviews a written

recommendation from the hearing officer, and makes a decision. *Id.* After receiving notice of the Board's final decision, an employee can challenge the Board's decision in state court under the Administrative Review Act, 735 ILCS 5/3-101 *et seq. See* 40 ILCS 5/9-236 (providing that the "provisions of the Administrative Review Law . . . shall apply to and govern all proceedings for the judicial review of final administrative decisions of the board provided for under this Article").

But Cox took none of those steps. He did not petition the Board to conduct a hearing on his application and seek a final decision. He did not challenge the Board's decision in state court, either. Instead, Cox filed this lawsuit. He alleged a denial of process after not taking advantage of the process afforded to him. He has not shown that the state process was inadequate. He simply skipped over the state process, and then entered federal court to complain about a lack of process.

Cox insists that the Board got it wrong as a matter of state law. *See* Pl.'s Mem. in Supp. of Summ. J., at 4–7 (Dckt. No. 175). Cox argues that the Board denied him duty disability benefits based on the dates of his workers' compensation agreement (the settlement covered a period running to May 1, 2014). *See* Workers' Compensation Commission Settlement Contract (Dckt. No. 214-26, at 2–3 of 3). Cox hammers the point that Illinois law does not allow the Board to deny duty disability benefits based on a workers' compensation settlement, citing an unpublished opinion. *See Nomellini v. Cook County Emps. and Officer Annuity and Benefit Fund*, 2018 IL App (1st) 162594-U (2018).

Maybe so. But a violation of state law, without more, is not a basis for a federal due process claim. "[W]e have long recognized that 'a mere error of state law' is not a denial of due process." *See Swarthout v. Cooke*, 562 U.S. 216, 222 (7th Cir. 2011) (quoting *Engle v. Isaac*,

456 U.S. 107, 121 n.21 (1982)); *see also Pro-Eco, Inc. v. Bd of Comm'rs of Jay Cty.*, 57 F.3d

505, 514 (7th Cir. 1995) ("'A violation of state law is not a denial of due process of law.'")

(citation omitted); *Gryger v. Burke*, 334 U.S. 728, 731 (1948) ("We cannot treat a mere error of

state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a

state court on state law would come here as a federal constitutional question."); *Snowden v.

Hughes*, 321 U.S. 1, 11 (1944) ("Mere violation of a state statute does not infringe the federal

Constitution."); *Hebert v. Louisiana*, 272 U.S. 312, 316 (1926) ("The due process of law clause

in the Fourteenth Amendment does not take up the statutes of the several states and make them

the test of what it requires . . . ."). "A state ought to follow its law, but to treat a violation of state

law as a violation of the Constitution is to make the federal government the enforcer of state

law." *See Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988). A violation of state

law, as a matter of *substance*, is not enough to create a federal claim about *process*.

The Board's motion for summary judgment on Count I is granted, and Cox's motion for

summary judgment is denied.

## II.     The Pension Protection Clause of the Illinois Constitution (Count III)

Cox also brings a claim under Article XIII, section 5 of the Illinois Constitution. That

provision establishes that membership in a state pension or retirement system is an enforceable

contractual relationship. *See* Ill. Const. art. XIII, § 5 ("Membership in any pension or retirement

system of the State . . . shall be an enforceable contractual relationship, the benefits of which

shall not be diminished or impaired."). This clause, Cox argues, means that the denial of his

benefits was a breach of contract in violation of the Illinois Constitution. *See* Pl.'s Mem. in

Supp. of Summ. J., at 11 (Dckt. No. 175). Not so.

Article XIII, section 5 protects state pensions from legislative encroachment. *See Dayton v. Oakton Cmty. Coll.*, 907 F.3d 460, 472 (7th Cir. 2018) ("The purpose of § 5 is to protect employees' pension[s] from legislative abrogation."); *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 54, 402 Ill. Dec. 1, 51 N.E.3d 753 (2016) ("[B]ecause retiree health care benefits provided by statute to state employees are benefits of membership in a public retirement system, they are constitutionally protected from unilateral diminishment or impairment through legislative action."); *Jones v. Mun. Employees' Annuity & Benefit Fund of Chicago*, 2016 IL 119618, ¶ 29, 401 Ill. Dec. 454, 50 N.E.3d 596 ("[U]nder its plain and unambiguous language, the clause prohibits the General Assembly from unilaterally reducing or eliminating the pension benefits conferred by membership in the pension system."); *In re Pension Reform Litig.*, 2015 IL 118585, ¶ 11, 392 Ill. Dec. 1, 32 N.E.2d 1 ("[O]nce an individual begins work and becomes a member of a public retirement system, any subsequent changes to the Pension Code that would diminish the benefits conferred by membership in the retirement system cannot be applied to that individual."); *Kanerva v. Weems*, 2014 IL 115811, ¶ 48, 383 Ill. Dec. 107, 13 N.E.3d 1228 ("[A]rticle XIII, section 5, was intended to eliminate the uncertainty that existed under the traditional classification of retirement systems and to guarantee that retirement rights enjoyed by public employees would be afforded contractual status and insulated from diminishment or impairment by the General Assembly."); *Kastel v. Winnetka Bd. of Educ., Dist. 36*, 946 F. Supp. 1329, 1342–43 (N.D. Ill. 1996) ("[M]embers in state-supported pension funds were fearful that the legislature might modify, diminish or abandon the pension plans. The constitutional provision was adopted to secure the status of the pension plans as they existed when the employees agreed to an employment contract, and to protect the plans against legislative abrogation.").

The Illinois Constitution ensures that the General Assembly will not "diminish[]" or "impair[]" benefits by rewriting the Pension Code. *See* Ill. Const. art. XIII, § 5. It is a constitutional buffer against statutory encroachment by the legislative branch. Article XIII, section 5 does not transform every run-of-the-mill denial of benefits into a constitutional violation.

Cox may believe that he is entitled to duty disability benefits under the Pension Code. And he may believe that the Board's decision is inconsistent with the statute. But the constitutional provision in question is about rewriting the Code, not applying the Code to a particular applicant for benefits. The denial of benefits by the Board – even the *wrongful* denial of benefits – does not rewrite the statute. The Board did not "diminish[]" or "impair[]" Cox's benefits – it simply decided that he wasn't entitled to benefits at all.

Cox has not come forward with any evidence that General Assembly changed the Pension Code and reduced his benefits. So he has no claim under Article XIII, section five of the Illinois Constitution. The Court grants Defendants' motion for summary judgment on Count III.

## III.  Unidentified Provisions of the Federal Constitution and the Illinois Constitution (Count IV)

In Count IV, Cox claims that the Board violated the United States Constitution and the Illinois Constitution. But the claim is non-descript. He alleges that the Board "was obligated by [the] Federal and State Constitution to provide Plaintiff pension benefits and was required to pay Plaintiff said benefits on an annual basis." *See* Fourth Am. Cplt., at ¶ 86 (Dckt. No. 141). He then claims that the Board "breached its civil, constitutional, and contractual obligation" by denying his claim for duty disability benefits. *Id.* at ¶ 87. The claim is generic, leaving the reader to wonder what constitutional provisions are at issue.

Cox did not shed any light in his briefs. The brief in support of his motion for summary judgment does not clear things up. *See* Pl.'s Mem. in Supp. of Summ. J. (Dckt. No. 175). In his response brief, Cox does not invoke any constitutional provision, except the Due Process Clause under the federal Constitution and the pension protection clause under the Illinois Constitution. *See* Pl.'s Mem. in Opp'n to Defs.' Mtn. for Summ. J., at 15–16 (Dckt. No. 189). But Count I already covers the Due Process Clause, and Count III already covers the pension protection clause. So Count IV offers nothing, except repetition.

Cox does not dispute the Board's characterization of Count IV as "an unspecified constitutional violation against the Board." *See* Pl.'s Resp. to Defs.' SMF, at ¶ 15 (Dckt. No. 190). The Board established that it is entitled to summary judgment on the two constitutional provisions that Cox identified. Cox has not come forward with anything else.

It is not the Court's role to figure out if any other constitutional provision applies. *See, e.g.*, *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[W]e have warned that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'") (citation omitted); *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) ("[I]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (citation omitted); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (refusing to "fill the void by crafting arguments and performing the necessary legal research" for a *pro se* litigant); *Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) ("It must be remembered that ours is an adversary system, and it is not the job of judges to do the work of lawyers.").

Cox has forfeited any argument under any other constitutional provision. The Court grants the Board's motion for summary judgment on Count IV.

## IV.    Breach of Fiduciary Duty (Count V)

Cox also sued the Board's trustees for breach of fiduciary duty under Illinois law.  *See* Fourth Am. Cplt., at ¶¶ 90–110 (Count V) (Dckt. No. 141).  That claim fails, too.  The trustees did not violate their fiduciary duties by denying Cox's application.

"Under Illinois law . . . recovery for a breach of fiduciary duty requires proof of three elements:  '[1] a fiduciary duty exists, [2] that the fiduciary duty was breached, and [3] that such breach proximately caused the injury of which the plaintiff complains.'"  *Gross v. Town of Cicero*, 619 F.3d 697, 709 (7th Cir. 2010) (internal citation omitted).  The Illinois Pension Code does impose fiduciary duties on the trustees, who must act "solely in the interest of the participants and beneficiaries."  *See* 40 ILCS 5/1-109.  Specifically:

> A fiduciary with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries and:
>
> (a)  For the exclusive purpose of:
>
> > (1)  Providing benefits to participants and their beneficiaries; and
> >
> > (2)  Defraying reasonable expenses of administering the retirement system or pension fund;
>
> (b)  With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims;
>
> (c)  By diversifying the investments of the retirement system or pension fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (d)  In accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund.

*See* 40 ILCS 5/1-109; *see also* 40 ILCS 5/1-101.2 (defining a "fiduciary" to include anyone who "has any discretionary authority or discretionary responsibility in the administration of the

pension fund or retirement system"); *Bd. of Trustees of Vill. of Barrington Police Pension Fund v. Dep't of Ins.*, 156 Ill. Dec. 146, 211 Ill. App. 3d 698, 570 N.E.2d 622, 627 (1991) (noting that the statutory provision "is essentially a codification of common law trust principles").[18]

The statute is chock-full of textual clues that it is aimed at the trustees' duty to the Fund as a whole, including all participants. It covers the duty of loyalty and the duty of care. *Id.* It prohibits self-dealing, prevents waste, and requires diversification. *Id.* And so on. There is no textual foothold for the notion that the denial of an individual employee's application, standing alone, may give rise to a fiduciary duty claim.

Cox's theory is that the trustees had a fiduciary duty under Illinois law to administer the fund "[i]n accordance with the provisions of the Article of the Pension Code governing the . . . fund." *See* 40 ILCS 5/1-109(d). Cox reads that provision to sweep broadly, requiring the trustees to ensure that the Fund "adhere[s] to proper procedural requirements" when making each individual disability determination. *See* Fourth Am. Cplt., at ¶ 105 (Dckt. No. 141). He claims that the trustees breached that duty when they adjudicated his claim without a hearing. *Id.* at ¶¶ 93, 105–06.

Cox also spells out what he believes is the statutory hook authorizing his individual suit for the trustees' alleged breach of fiduciary duty. He relies on section 1-115 of the Illinois Pension Code, which allows for a civil action "by a participant [or] beneficiary[.]" *See* 40 ILCS

---

[18] Cox also brought a fiduciary duty claim against Margaret Fahrenbach, in addition to the trustees. *See* Fourth Am. Cplt., at ¶ 90 (Dckt. No. 141). Fahrenbach is counsel to the Board. *Id.* at ¶ 12; *see also* Pl.'s Resp. to Defs.' SMF, at ¶¶ 12–13 (Dckt. No. 190). Fahrenbach is not a fiduciary within the meaning of Pension Code because she did not have "any discretionary authority or discretionary responsibility in the administration of the pension fund or retirement system." *See* 40 ILCS 5/1-101.2; *see also Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004). The authority to decide the merits of an application rests with the Board itself, not legal counsel. In any event, Cox did not respond to the argument that Fahrenbach does not owe a fiduciary duty, and thus it is waived. *See* Defs.' Reply, at 12 (Dckt. No. 192) (noting the lack of a response).

5/1-115. But importantly, that provision allows for lawsuits only for specified purposes. In particular, "the Attorney General or . . . a participant, beneficiary or fiduciary [may sue] in order to: (a) Obtain appropriate relief under Section 1-114 of this Code; (b) Enjoin any act or practice which violates any provision of this Code; or (c) Obtain other appropriate equitable relief to redress any such violation or to enforce any such provision." *Id.*

A careful reading of the text reveals that Cox's claim does not fit within any of those boxes. Right off the bat, it is apparent that subsections (b) and (c) do not apply because Cox is not seeking an injunction or other equitable relief. Instead, he wants compensatory and punitive damages to make up for the lack of disability benefits. *See* Fourth Am. Cplt., (Count V) (Dckt. No. 141).

That leaves only subsection (a)'s reference to "appropriate relief under Section 1-114 of this Code" as a possible textual hook for Cox's fiduciary duty claim. But this statutory language does not help Cox, either. Section 1-114 authorizes a claim for breach of fiduciary duty against individuals who misuse assets of the Fund:

> Any person who is a fiduciary with respect to a retirement system or pension fund established under this Code who breaches any duty imposed upon fiduciaries by this Code . . . shall be personally liable to make good to such retirement system or pension fund any losses to it resulting from each such breach, and to restore to such retirement system or pension fund any profits of such fiduciary which have been made through use of assets of the retirement system or pension fund by the fiduciary, and shall be subject to such equitable or remedial relief as the court may deem appropriate, including the removal of such fiduciary.

*See* 40 ILCS 1-114(a).

But Cox doesn't want the fiduciaries to "make good to such . . . *pension fund* any losses" that resulted from his denial of benefits. *Id.* (emphasis added). He doesn't want the trustees to pay for losses "to *it*" – meaning the Fund – at all. *Id.* (emphasis added). He doesn't want to "restore" to the Fund "any profits," either. *Id.* Instead, Cox wants the trustees to pay damages to

49

*him*, not to the Fund. *Id.* That makes section 1-114 inapplicable. So, despite the Pension Code's reference to suits by "a beneficiary," the denial of an individual beneficiary's application for benefits cannot give rise to a claim for a breach of fiduciary duty.

Case law from the ERISA context – which the parties agree informs this Court's reading of the Illinois Pension Code – bolsters this conclusion. *See* Pl.'s Mem. in Supp. of Summ. J., at 14 (Dckt. No. 175) ("Since the liability provision are similar to those under the Employment Retirement Income Security Act (29 U.S.C. §§ 1001 – 1461 (ERISA)), case law dealing with the liability of pension trustees under that law may provide guidance."); Pl.'s Mem. in Opp'n to Defs.' Mtn. for Summ. J., at 19 (Dckt. No. 189) (same); Defs.' Mem. in Supp. of Summ. J., at 13 (Dckt. No. 172) ("In considering whether a fiduciary under the Illinois Pension Code has breached its fiduciary duty, Illinois courts have looked for instruction from federal law interpreting analogous provisions of ERISA."). Indeed, the language of the Illinois Pension Code is lifted in large part from ERISA. *Compare* 29 U.S.C. §§ 1109 *with* 40 ILCS 5/1-114; *see also Sweeney v. Illinois Municipal Ret. Fund*, 2019 WL 1254925, at *7 (N.D. Ill. 2019) (invoking ERISA cases "for guidance when interpreting the Illinois Pension Code"); *Bd. of Trustees of Vill. of Barrington Police Pension Fund*, 570 N.E.2d at 626 ("[W]e note that given the lack of Illinois caselaw construing the relevant portions of the Pension Code, we look for guidance to analogous provision of the Employee Retirement Income Security Act of 1974 . . . and federal caselaw construing ERISA.") (internal citation omitted).

The Seventh Circuit has held that an individual cannot bring suit under ERISA's fiduciary duty provisions to challenge the denial of benefits. *See Sumpter v. Metropolitan Life Ins. Co.*, 683 Fed. Appx. 519, 521 (7th Cir. 2017). The Seventh Circuit reasoned that "a provision of ERISA authorizing courts to award 'appropriate equitable relief' for breaches of

fiduciary duties" did not support a claim for a denial of benefits. "[A] denial of benefits, without more, does not constitute a breach of fiduciary duty that can be remedied under the equitable-relief provision." *Id.* (citing *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 373 (6th Cir. 2015) (en banc) (recognizing that claimant may not pursue equitable relief when his claim for breach of fiduciary duty amounts to nothing more than a repackaged claim for wrongful denial of benefits)); *see also Day v. Humana Ins. Co.*, 335 F.R.D. 181, 195–96 (N.D. Ill. 2020) (explaining that, for ERISA claims, dismissal is warranted if a "Plaintiff's claim for equitable relief is duplicative of her benefits claim" but not when the claims "are premised on different facts or seek different remedies").

A fiduciary duty claim is a poor textual fit for an individual grievance about the denial of one employee's application. It is a poor conceptual fit too, as the trustees' fiduciary duties are meant to safeguard the Fund as a whole. The fiduciary duty "is owed to *all* participants in the pension fund, not just plaintiff." *Marconi v. Chicago Heights Police Pension Bd.*, 225 Ill. 2d 497, 544, 312 Ill. Dec. 208, 870 N.E.2d 273 (2006), *as modified on denial of rehearing* (2007) (emphasis in original).

Even if a fiduciary duty applied in this context, weeding out undeserving applications would be in the interest of the Fund as a whole, and thus would align with any fiduciary duties. "Perhaps the most important function of a pension board is to ensure adequate financial resources to cover the Board's obligations to pay current and future retirement and disability benefits to those who qualify for such payments. An important part of this responsibility involves the screening of unqualified or fraudulent disability claims, so that funds are not unfairly diverted to undeserving applicants." *Id.*

Defendants did not breach a fiduciary duty by denying Cox's application for duty disability benefits after April 13, 2014. Defendants are entitled to summary judgment on Count V.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on all counts, and denies Plaintiff's motion for summary judgment.

Date:   May 29, 2021

_____
Steven C. Seeger
United States District Judge